**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In Re: | ) | Chapter 11 |
| | ) | |
| **POWERWAVE TECHNOLOGIES, INC.** | ) | Case No. 13-10134 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | **Hearing Date: TBD** |
| | ) | **Objection Deadline: TBD** |

**EXPEDITED MOTION OF OCEUS NETWORKS INC. TO COMPEL DEBTOR TO
ASSUME OR REJECT CONTRACT AND FOR RELIEF FROM STAY TO RETAIN
CERTAIN PAYMENTS UNTIL RECOUPMENT AND/OR SETOFF DETERMINATION**

       Oceus Networks Inc. ("Oceus") submits this motion (the "Motion") for entry of an order

compelling debtor Powerwave Technologies, Inc. ("Debtor") to assume or reject a certain DAS

Design Subcontract (the "Contract"), dated November 7, 2011, by and among Oceus and Debtor.

Additionally, by this Motion, Oceus seeks relief from stay to retain certain amounts currently due

and owing to Debtor pursuant to the Contract until all recoupment and/or setoff claims can be

determined.  In support of this Motion, Oceus respectfully states as follows:

**PRELIMINARY STATEMENT**

       1.      Prior to the commencement of Debtor's bankruptcy case, Oceus entered into a

certain master contract, dated November 7, 2011, with Skanska U.S.A Building, Inc.

("Skanska"), pursuant to which Oceus, as Skanska's subcontractor, was to provide certain goods

and services as part of the refurbishment of the headquarters of a certain large international

organization ("IO") in New York, New York (the "IO Headquarters").  Also on November 7,

2011 Oceus entered into the Contract with Debtor, as subcontractor to Oceus, to provide certain

goods and services that include a fixed period of guaranteed support maintenance and as such are

necessary in order for Oceus to complete the terms of its contract with Skanska.  A true and accurate copy of the Contract is attached hereto at **Exhibit A**.

2.      By this Motion, Oceus requests an order of this Court directing Debtor to assume or reject the Contract within seven (7) days of entry of an order allowing this Motion.  Absent the relief requested herein, Oceus will remain in limbo, where any step it takes may cost it millions of dollars, because in order to meet the requirements of the Contract, Oceus must provide the IO with a single DAS (Distributed Antenna System) system comprised of components produced by one vendor. Further, a key component of the services required pursuant to the Contract is a significant warranty and support obligation by Debtor.  Therefore, if Debtor later rejects the contract or ceases to perform under it at any point in the future, Oceus may need to rip out the components installed by Debtor and reinstall an entirely new system from a new subcontractor.  This would entail tearing down and replacing parts of the structure of the IO Headquarters.  The cost to Oceus would be prohibitive.

3.      Additionally, Oceus is currently holding certain recently received amounts which may be due and owing to Debtor pursuant to the Contract.  However, due to Debtor's multiple defaults, Oceus believes it has a recoupment and/or setoff claim against these amounts. By this Motion, Oceus requests that the Court grant it relief from stay to temporarily retain these amounts until all recoupment and/or setoff claims can be determined.

4.      Expedited determination is necessary on this Motion because if Debtor ceases to perform on the Contract two months from now, Oceus will incur damages approximately $340,000 higher than if the cessation of performance occurred now.

5.      Oceus has taken all reasonable steps to avoid the necessity to file this Motion, including discussing the matter with Debtor's counsel.  However, no agreement could be reached, and accordingly, Oceus has been left with no alternative but to file this Motion.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief sought herein are sections 105(d)(2)(A), 362(d) and 365(d)(2) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

8.      On January 28, 2013 (the "Petition Date") Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.   Since the Petition Date, Debtor has continued in possession of its assets and to manage its business affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9.      On November 7, 2011, Oceus entered into a construction contract (the "Master Contract") with Skanska.

10.       Pursuant to the Master Contract, Oceus is to provide certain work required in the refurbishment of the IO Headquarters, and may contract with subcontractors approved by Skanska to complete this work. Subcontractors who are approved by Skanska must be willing to accept "as-is" the terms of the agreement between the IO and Skanska, which include, among others, an obligation to provide even materials and services that are not expressly called for in

the contract, for so long as these materials and services are deemed "required to complete all this work to the satisfaction of Skanska USA and the [IO]."[1]

11.    Pursuant to the Master Contract, Oceus entered into the Contract, a subcontract pursuant to which Debtor was to provide a distributed antenna system design that meets or exceeds pre-established system performance specifications, supply the components necessary to build out that design, and ensure adequate support services for a fixed period after installation. The Contract incorporates the Master Contract by reference. *See* Contract, Sec. 1.2.

12.    Debtor has breached the Contract in multiple ways, both pre- and post-petition.

**The Defaults**

13.    Pursuant to the Contract, Exhibit A, Sections 3, 7 and 9.3, and Exhibit E Section 2.1 and 2.21, Debtor is responsible for delivery of certain goods.  Debtor has failed to provide certain parking basement infrastructure (generic cabling, connectors, antennas, and passive radio-frequency devices that are not unique to the DAS system but essential to its operation), due at the end of January 2013, and disclosed in an email to Oceus that this default was due to the fact that the manufacturer would not extend credit to Debtor, and Debtor was unable to purchase the required equipment without such credit.  A true and accurate copy of this email is attached hereto as **Exhibit B**. In order to ensure delivery of the infrastructure, Oceus purchased substitute infrastructure from two other vendors, incurring to itself an additional cost of approximately $60,000. Notwithstanding Oceus' efforts to get the infrastructure installed in a timely manner, the delay encountered as a result of having to source material from other vendors in turn resulted in having to install the infrastructure on finished surfaces, thereby incurring an additional cost to

---

[1] *See* Master Contract, Ex. E, Sec. 2.1.

Skanska of approximately $10,000 in repainting or establishing new cabling routes, which Skanska could now potentially charge to Oceus' account.

14.     Similarly, Debtor failed to deliver similar infrastructure required for the administration building (the "Administration Building"), which was scheduled for delivery and installation by February 11, 2013. The total cost incurred by Oceus to purchase substitute infrastructure from another vendor was $2379.50.

15.     On February 27, 2013, Debtor informed Oceus via email that it is unable to provide new equipment, as Debtor acknowledged is required by the Contract, Ex. E, Sec. 17.1, and asked that Oceus allow refurbished equipment to be used instead. A true and accurate copy of this email is attached as **Exhibit C** hereto.  However, Oceus cannot accommodate Debtor's request without risking defaulting on its Master Contract with Skanska.

16.     Debtor failed to deliver the final November test report for the Administration Building, as required by Exhibit A, Sections 9.5 and 9.6 of the Contract. The test reports ensure compliance of the DAS system with the system performance specifications and standards required by the Master Contract. Because portions of the Administration Building system have already been tested by Debtor, future inability by Debtor to complete testing and substantiation of testing reports for the remaining portions would mean that Oceus would have to redo testing of the entire building in order to submit a complete compliance report to Skanska, at an additional cost of approximately $85,000. [2/]

17.     Preliminary test results received from Debtor on January 18, 2013, which should have been provided by early December, 2012,[3/] for the Administration Building shows a deficiency in the system design for the 9th Floor. This design deficiency should have been

---

[2/] *See* Contract, Ex. A, Sec. 3.2, Items 49, 50, and 52.
[3/] *See* Contract, Ex. A, Sec.8, Table 1, par. 4.

corrected at Debtor's cost per the Contract, Ex. A, Sec. 3. Inability of Debtor to correct it will mean that Oceus will have to incur additional costs to remedy, in the approximate amount of $6,500.

18.     Debtor failed to provide appropriate professionals, namely a CAD draftsman and a CAD engineer, pursuant to Ex. A, Sections 5.1.2 and 5.1.3. of the Contract.  While a new CAD draftsman has been recently assigned by Debtor to the project, this person will have to spend considerable time becoming familiar with the project before he or she can perform the duties required pursuant to the Contract. Additionally, while a new engineer has recently been assigned by Debtor to the project, this engineer failed to appear at an agreed-upon time, and his future attendance to his duties is uncertain.  The lack of an on-site engineer resulted in an inability of Oceus to confirm an alternative solution proposed to the retesting of the Administration Building. In addition, not having an on-site engineer has resulted in delays in the delivery of design materials for the Parking Garage/Basement,[4] delays in as-built drawings for the Administration Building,[5] inability to monitor the installation and the quality of the installation for the Parking Garage/Basement,[6] which increases the risk that otherwise correctible errors would go uncured. The cost to Oceus to replace the engineer would be approximately $200,000 per year until the end of the contract. Future liability of Oceus for an improperly installed DAS system is at this time unquantifiable but could reach potentially astronomical proportions.

19.     Debtor has failed to report monitoring and alarm alerts for system outages, as required by Ex. E, Section 17.1 and Ex. A, Compliance matrix Article 1.3.35 of the Contract. Specifically, a power outage occurred over the weekend of February 2-3, 2013, but Debtor failed

---

[4] *See* Contract, Ex. A, Sec. 9.2.
[5] *See* Contract, Ex. A, Sec. 9.6.
[6] *See* Contract, Ex. A, Sec. 9.4.

to notify the appropriate parties, including Oceus, thus hampering Oceus' and Skanska's ability to track down and correct possible sources of malfunctions.

20.     Debtor has failed to complete the drawings for the Administration Building in a timely manner, as required by Ex. A, Section 9.6 of the Contract. As a result, Oceus has had to undertake costs for production and printing of interim deliverables to Skanska at a cost of approximately $6,000. Further, this default, in tandem with the various other defaults regarding the Administration Building, has resulted in Oceus' inability to apply for verification of substantial completion under the Master Contract and invoice Skanska accordingly.

21.     Debtor has failed to complete the location survey for Parking Garage/Basement as required by Ex. A, Sections 9.1 and 9.2 of the Contract and has consequently resulted in an inability of Oceus to invoice Skanska for the amount corresponding to the survey.

## RELIEF REQUESTED

22.     Oceus respectfully requests that the Court enter an order on an expedited basis, substantially in the form attached hereto as **Exhibit D**, compelling Debtor to either assume or reject the Contract within seven (7) days of entry of an order allowing this Motion and, to the extent Debtor fails to assume the Contract by such date, deeming such Contract to be rejected as of such date.

23.     Additionally, Oceus respectfully requests that the Court grant it relief from stay to retain the amounts due to Debtor pursuant to the Contract until such time as all recoupment and/or setoff claims are determined.

24.     Expedited determination is necessary on this Motion because if Debtor ceases to perform on the Contract two months from now, Oceus will incur damages approximately $340,000 higher than if the cessation of performance occurred now due to additional installation

of Debtor's components, which will necessitate substantial hardware replacements, redesigning

and retesting, as described in more detail below.

**BASIS FOR THE RELIEF REQUESTED**

I.      **The Balance of Equities Require that the Court Compel Debtor to Reject the Contract.**

25.     Under section 365(d)(2) of the Bankruptcy Code, a debtor generally may assume

or reject an executory contract any time before confirmation of a plan of organization.  However,

the time afforded the Debtors to evaluate the benefits for the assumption or rejection of

executory contracts is not without limits.  Section 365(d)(2) itself provides that a court may, on

the request of a party to such contract, shorten the period of time within which the debtor must

make a decision regarding whether to assume or reject such contract.

26.     In this regard, section 365(d)(2) of the Bankruptcy Code provides:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume
> or reject an executory contract or unexpired lease of residential real
> property or of personal property of the debtor at any time before the
> confirmation of a plan but the court, **on the request of any party to such
> contract or lease, may order the trustee to determine within a
> specified period of time whether to assume or reject such contract or
> lease.**

11 U.S.C. § 365(d)(2) (emphasis added).

27.     Further, pursuant to section 105(d)(2) of the Bankruptcy Code, courts have

authority to enter an order compelling debtors to assume or reject executory contracts by a date

certain. 11 U.S.C. § 105(d)(2)(A) (courts have the authority to issue various kinds of orders,

including an order that "sets the date by which the trustee must assume or reject an executory

contract or unexpired lease").

28.     In determining whether to require a debtor to assume or reject an executory

contract, the court must balance the interests of the non-debtor contracting party against the

8

interests of the debtor and the bankruptcy estate.  *In re Physician Health Corp.,* 262 B.R. 290, 292 (Bankr. D. Del. 2001) (Walrath, J.); *see also N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 551-52 (1984) (in certain circumstances, the rights of the non-debtor party to an executory contract to know its position with respect to the debtor and the contract at issue would outweigh the need of the debtor in possession for unlimited flexibility and breathing space).

> **i.      *Balancing the Interests of Debtor and Oceus Supports Oceus' Request to Compel Debtor to Promptly Reject the Contract.***

29.      There can be little doubt that prolonging the decision whether to assume or reject the Contract creates grave difficulties for Oceus, stemming from the unique nature of the services at the root of the Contract.  Further, given Debtor's record of delay and non-performance, with each passing day it becomes increasingly more likely that Oceus may incur substantial damages if this situation is not rectified immediately.

30.      Pursuant to the Contract, Debtor is responsible for designing, providing and installing a comprehensive antenna system within the refurbished IO Headquarters (the "System").  The Master Contract and the Contract both require that that the System be backed up by one year of support from the time of final acceptance by Skanska and the IO of Debtor's completion of System installation. This System is embedded in walls and other building infrastructure.

31.      Approximately 65 percent of the System has already been installed, but 35 percent remains unfinished.  Additionally, 3 years remain for the support obligation, which expires on March 30, 2016 (the "Support Expiration Date"), one year after the currently scheduled completion date of March 30, 2015.   Per the terms of the Contract,[7] this Support Expiration Date may be pushed out to a later date if delays on the Contract performance continue

---

[7]      *See* Contract, Ex.A, 1.3.18.

to occur. However, the completion date has been delayed several times due to Debtor's defaults, and it cannot be delayed any further without increasing the risk of Oceus defaulting on its Master Contract with Skanska.

32.     If, at any time prior to the Support Expiration Date, Debtor rejects the Contract, ceases to perform under it, or sells its assets to a buyer who is unable or uninterested in assuming the Contract (or who cannot meet the exacting standards of the IO or Skanska), the System would become useless because of the lack of support.  Therefore, in order to comply with the terms of the Master Contract, Oceus would be forced to replace the entire System.[8]

33.     Although at this point in time 65 percent has already been installed, replacing the System as it now stands would be significantly less cumbersome and costly, and would require much less replacement of equipment and destruction of completed building infrastructure than if the System were fully installed and the building completed.

34.     Every day that goes by with the Contract in full force and effect brings the System closer to completion, and therefore raises the price tag on replacement in the future, should the Contract be rejected or Debtor or the buyer of Debtor's assets fail to perform under it. In fact, if Debtor ceases to perform on the Contract two months from now, Oceus will incur damages approximately $340,000 higher than if the cessation of performance occurred now.  These damages are attributable to costs of redesigning, replacing and installing new hardware, retesting for the new equipment, and costs of the delay to Oceus' overall performance pursuant to the Master Contract.

---

[8]  If the Contract were rejected, a small chance exists that the System would not have to be completely replaced, but rather that Skanska, and more importantly, the IO would allow a replacement vendor to take up the completion and maintenance of the existing System.  However, in preliminary discussions with Skanska, it did not express willingness to allow such a "hybrid" system, and in any case, it would be extremely difficult, if not impossible, for Oceus to find a new vendor who would agree to take up the cumbersome task of completing and maintaining another company's system for the amount of payments still due under the Contract. The small chance becomes even smaller as time passes because the work comes closer to completion by Debtor.

35.     Not only does replacement become more costly, but it creates a significant delay in the work on the IO Headquarters of not only Oceus, but many other vendors and contractors who must wait until Oceus' work is completed in order to perform their contracts.   Therefore, not only would any delay create grave economic harm to Oceus, but it could create significant delays for a project involving thousands of employees, dozens (if not hundreds) of contractors, and many millions of dollars.

36.     By comparison, the harm to Debtor if it were to reject the Contract at this time is minimal.[9/]  Not only has Debtor already been paid the majority – approximately 65 percent – of the amounts due to it for full performance under the Contract, but the remainder of the amounts due require Debtor to render performance over several years, creating a significant obligation that would provide Debtor minimal, if any, economic benefit, and would likely be highly unattractive to any potential purchaser of Debtor's assets.

37.     Debtor has already moved this Court to reject certain other contracts (*see* docket # 64, Feb. 5, 2013).  Therefore, it is evident that Debtor is in the process of evaluating the usefulness of its contracts, and would not be unduly burdened by an order of this Court to determine whether to assume or reject the Contract within a limited timeframe.

38.     Therefore, weighing the hardships both parties would suffer, it is clear that the equities favor a prompt and immediate rejection or assumption of the Contract by Debtor.

    **ii.      *Debtor Cannot Assume the Contract Because it Cannot Cure the Defaults.***

39.     Pursuant to Section 365(b)(1), if a debtor determines to assume a contract, it may not do so until it "(1) cures or provides adequate assurance that it will promptly cure the default; (2) compensates or provides adequate assurance of prompt future compensation for actual

---

[9/]  Although Oceus would have a rejection claim, that claim would be in an amount far smaller than if Debtor continues performance and defaults later on.

pecuniary loss resulting from the default; and (3) provides adequate assurance of future performance under the contract or lease." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291, 298 (3d Cir. 2000).

40.     As clarified by the BAPCPA amendments to sections 365(b)(1)(A) and 365(b)(2)(D), nonmonetary defaults in non-lease executory contracts are not exempt from the cure obligation other than to the extent a party could argue that the underlying covenant was an unenforceable penalty provision. *See, e.g., Quantum Diversified Holdings, Inc. v. Wienheimer (In re Escarent Entities, L.P.)*, 423 Fed. Appx. 462 (5th Cir. 2011) (holding that the debtor in possession could not assume a prepetition contract to sell real property because of the existence of an incurable nonmonetary default); Will Hueske, *It's Too Late, Baby, Now It's Too Late: the New Cure Standard for Nonmonetary Defaults Under Section 365(b)*, Weil Gotshall Bankruptcy Blog, May 23, 2011, available at http://business-finance-restructuring.weil.com/executory-contracts/it%E2%80%99s-too-late-baby-now-it%E2%80%99s-too-late-the-new-cure-standard-for-nonmonetary-defaults-under-section-365b/.

41.     As described above, Debtor has defaulted on the Contract multiple times, both pre- and post-petition, causing Oceus grave difficulties in complying with its Master Contract with Skanska

42.     The many defaults by Debtor of the Contract cannot be cured, and therefore Debtor cannot assume the Contract.  These defaults have created significant delays in the schedule of work on both the Contract, the Master Contract and the overall work on the IO Headquarters, delays that cannot be rectified by any actions by Debtor but can only be slightly mitigated by a prompt rejection of the Contract.

### iii.    *Debtor Cannot Assume the Contract because it is a Personal Services Contract.*

43.    11 U.S.C. 365(c)(1) states that:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment…

44.    Section 365(c) exempts personal service contracts.  *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 682 (3d Cir. 1993). *See also In re Taylor*, 913 F.2d 102, 106 (3d Cir. N.J. 1990) ("§ 365(a) permits a trustee to assume or reject any executory contract, but § 365(c) adds the limitation that a trustee may not assume or assign an executory contract for personal services unless the parties consent.").

45.    Whether a contract is personal in nature depends "'upon the nature of the subject of the contract, the circumstances of the case and the intent of the parties to the contract.'" *Id.* at 683.  A contract for "personal services contemplates performance of contracted-for duties involving the exercise of special knowledge, judgment, taste, skill, or ability." *In re Rooster, Inc.*, 100 B.R. 228, 232 (Bankr. E.D. Pa. 1989); *see also In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986) ("Personal service contracts synthesize into those consensual agreements of ineluctable genre and distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste.").

46.    While Oceus could replace Debtor's performance with that of another, carefully picked subcontractor, such replacement would have to be vetted and approved by both Skanska

13

and the IO, [10/] and would require a subcontractor with special knowledge and skills appropriate for the delicate task at hand. Oceus estimates that currently, only two or three vendors exist who could perform the Contract.

47.    Therefore, not only is Debtor prohibited from assuming the Contract due to its many defaults, but it cannot assume the Contract because it is a personal services contract.

### iv.    *If Debtor is Allowed to Assume the Contract Despite Its Incurable Defaults, It Must Provide Adequate Assurance of Future Performance.*

48.    As described above, Debtor's defaults cannot be cured. However, even if it were possible for Debtor to cure those defaults, it would have to provide adequate assurance of future performance under the Contract pursuant to Section 365(b)(1).

49.     Because of the unique nature of the services required pursuant to the Contract, such adequate assurance of future performance must include compensation, in case of failure to perform under the Contract, for the full cost of replacing the System with an entirely new system by a new subcontractor.

50.    Therefore, adequate assurance of future performance must be in the form of an escrow account containing no less than $1,008,994.25, comprised of: (1) $599,423, the full amount Oceus would have to pay a new subcontractor to design, provide, and support a new system; (2) $369,791.25, the approximate cost of removing Debtor's system from the IO Headquarters; and (3) $39,780.00 the approximate cost to Oceus of the delay that will be created by this replacement.

---

[10/]    *See* Master Contract, Ex. A, Sec. 1.1 that incorporates by reference Trade Contractor Proposal Rev E (the "Proposal"). In that Proposal, Oceus commits to providing Skanska/IO with "Powerwave's technology for the wideband fiber optic Distributed Antenna System." The Proposal refers to Debtor's system a total of 59 times, and is highlighted as a key deliverable of the Master Contract. While Skanska has agreed to allow replacement of Debtor by another approved subcontractor, such subcontractor would have to conform to Skanska's exacting standards.

51.     As detailed above, because postponement of decision upon assumption or rejection of the Contract by two months will cause Oceus to incur approximately $340,000 in additional damages, if Debtor seeks to assume the Contract two months from now, then adequate assurance of future performance will require an escrow account containing no less than $1,348,994.25.

**II.     Cause Exists to Modify the Automatic Stay to Allow Oceus to Retain Amounts Owed to Debtor Until all Recoupment and/or Setoff Claims are Determined.**

52.     Pursuant to Section 362(d) of the Bankruptcy Code:

> On request of a party in interest and after notice of a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay –
>
>> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause." Instead, "[c]ause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997)).

53.     Oceus is currently holding approximately $168,201.29 which may be owed to Debtor pursuant to the Contract for services rendered by Debtor during October of 2012 (the "Amounts Due"). These Amounts Due became due only a short time ago, on February 11, 2013, when Oceus was paid by Skanska for services rendered during that period.

54.     Because of Debtor's above-described multiple defaults under the Contract, both pre- and post-petition, including at least two defaults that forced Oceus to pay approximately $62,500 for components that Debtor failed to deliver, as well as defaults that have caused Oceus

to incur approximately $40,000 in internal labor costs, and other defaults requiring Oceus to advance various amounts in the past and going forward, Oceus reasonably believes it has a recoupment and/or offset claim, therefore cause exists for temporary modification of the automatic stay to allow for such recoupment and/or offset claim to be determined by the Court.[11]

55.     By this Motion, Oceus requests temporary relief from stay to retain these Amounts Due until such recoupment and/or offset claims may be determined.[12]

## NOTICE

56.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) counsel to the Debtor; (iii) counsel to the Official Committee of Unsecured Creditors; and (iv) the general service list established in this chapter 11 case pursuant to Bankruptcy Rule 2002.  Oceus submits that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

57.     No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

58.     For all of the reasons set forth above, Oceus respectfully requests that this Court (i) compel Debtor to either assume or reject the Contract within seven (7) days of the Court's allowance of this Motion; (ii) to the extent Debtor fails to assume the Contract as of such date, deem the Contract to be rejected as of such date; (iii) to the extent Debtor assumes the Contract,

---

[11]     "The doctrine of recoupment is an equitable remedy that allows the offset of mutual debts when the respective obligations originate from the same transaction or occurrence." *In re Commun. Dynamics, Inc.*, 300 B.R. 220, 225 (Bankr. D. Del. 2003) (Walrath, J.).  The automatic stay does not apply to recoupment claims.  *See, e.g., In re Mewborn*, 367 B.R. 529, 535 (Bankr. D.N.J. 2006) ("a creditor claiming recoupment need not apply for stay relief"). However, this request is being made in the abundance of caution, only to preserve the status quo while these matters are resolved.

[12]     To the extent applicable under these circumstances, this Motion also seeks that the waiting period pursuant to Fed. R. Bankr. P. 4001(a)(3) be waived.

require Debtor to provide adequate assurance of future performance in the form of an escrow account containing no less than $1,008,994.25, and grant relief from stay to allow Oceus to apply these funds as it deems necessary; (iv) grant relief from stay to retain the Amounts Due; and (v) grant such other relief as this Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____*/s/ Curtis S. Miller*_____
Robert J. Dehney (Bar No. 3578)
Curtis S. Miller (Bar No. 4583)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:   (302) 658-3989

   -and-

MINTZ LEVIN COHN FERRIS GLOVSKY
AND POPEO, PC
Richard E. Mikels, Esq.
Ella Shenhav, Esq.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
E-mail: remikels@mintz.com
       eshenhav@mintz.com

*Attorneys for Oceus Networks Inc.*

12372008v.8