**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____
                                                      )
In Re:                                               )          Chapter 11
                                                      )
**POWERWAVE TECHNOLOGIES, INC.** )          Case No. 13-10134 (MFW)
                                                      )
                        Powerwave.          )
                                                      )
                                                      )
_____)

**DECLARATION OF DANIEL GOLDBERG IN SUPPORT OF EXPEDITED MOTION
OF OCEUS NETWORKS INC. TO COMPEL POWERWAVE TO ASSUME OR
REJECT CONTRACT AND FOR RELIEF FROM STAY TO RETAIN CERTAIN
PAYMENTS UNTIL RECOUPMENT AND/OR SETOFF DETERMINATION**

I, Daniel Goldberg, hereby declare and state as follows:

1.      I am a project manager at Oceus Networks Inc. ("Oceus"), a corporation engaged

in providing broadband services and solutions worldwide to deliver high-speed voice, video and

data communications. I have been employed by Oceus since its inception in January 2011, and

was employed by Ericsson, Oceus' predecessor, since 1991.  In the capacity of my position, I

have detailed knowledge of the Skanska project for which Powerwave is a subcontractor to

Oceus.

2.      I am over the age of 18 years and am competent to testify about the facts recited

in this Affidavit.  I make this Affidavit based upon my personal knowledge and in support of

Oceus's Expedited Motion to Compel Powerwave to Assume or Reject Contract and for Relief

from Stay to Retain Certain Payments until Recoupment and/or Setoff Determination (the

"Motion to Compel").

3.      On November 7, 2011, Oceus entered into a construction contract (the "Master

Contract") with Skanska. Pursuant to the Master Contract, Oceus is to provide certain work

required in the refurbishment of the headquarters of a certain large international organization (the "IO"), the identity of which Oceus is not at liberty to publicly disclose (the "IO Headquarters"), and may contract with subcontractors approved by Skanska to complete this work. Subcontractors who are approved by Skanska must be willing to accept "as-is" the terms of the agreement between the IO and Skanska, which include, among others, an obligation to provide even materials and services that are not expressly called for in the contract, for so long as these materials and services are deemed "required to complete all this work to the satisfaction of Skanska USA and the [IO]."[1]

4.      Performance pursuant to the Contract requires special knowledge and skills by the chosen subcontractor. Oceus estimates that currently, only two or three vendors exist who could perform the Contract.

5.      Pursuant to the Master Contract, Oceus entered into the Contract with Powerwave Technologies, Inc. ("Powerwave"), a subcontract pursuant to which Powerwave was to provide a distributed antenna system design that meets or exceeds pre-established system performance specifications, supply the components necessary to build out that design, and ensure adequate support services for a fixed period after installation. A true and accurate copy of the Contract is attached as **Exhibit A** to the Motion to Compel.  The Contract incorporates the Master Contract by reference.  *See* Contract, Sec. 1.2.

6.      Pursuant to the Contract, Powerwave is responsible for designing, providing and installing a comprehensive antenna system within the refurbished IO Headquarters (the "System").  The Master Contract and the Contract both require that that the System be backed up by one year of support from the time of final acceptance by Skanska and the IO of Powerwave's

---

[1] *See* Master Contract, Ex. E, Sec. 2.1.

completion of System installation. This System is embedded in walls and other building infrastructure.

7.    Approximately 65 percent of the System has already been installed, but 35 percent remains unfinished. Additionally, 3 years remain for the support obligation, which expires on March 30, 2016 (the "Support Expiration Date"), one year after the currently scheduled completion date of March 30, 2015. Per the terms of the Contract, this Support Expiration Date may be pushed out to a later date if delays on the Contract performance continue to occur. However, the completion date has been delayed several times due to Powerwave's defaults, and it cannot be delayed any further without Oceus risking a default on its Master Contract with Skanska.

8.    If, at any time prior to the Support Expiration Date, Powerwave ceases performance under the Contract for any reason whatsoever, the System would become useless because of the lack of support. Therefore, in order to comply with the terms of the Master Contract, Oceus would be forced to replace the entire System.[2]

9.    Although at this point in time 65 percent has already been installed, replacing the System as it now stands would be significantly less cumbersome and costly, and would require much less equipment and destruction of completed building infrastructure than if the System were fully installed and the building completed.

10.    Every day that goes by with the Contract in full force and effect brings the System closer to completion, and therefore raises the price tag on replacement in the future, should

---

[2] If the Contract were terminated, a small chance exists that the System would not have to be completely replaced, but rather that Skanska and more importantly, the IO would allow a replacement vendor to take up the completion and maintenance of the existing System. However, in preliminary discussions with Skanska, it did not express willingness to allow such a "hybrid" system, and in any case, it would be extremely difficult, if not impossible, for Oceus to find a new vendor who would agree to take up the cumbersome task of completing and maintaining another company's system for the amount of payments still due under the Contract. The small chance becomes even smaller as time passes because the work comes closer to completion by Powerwave.

Powerwave's failure to perform necessitate such a replacement.  Oceus' damages resulting from the continuation of the Contract will increase in the next two months by approximately $340,000. These damages are attributable to costs of redesigning, replacing and installing new hardware, retesting for the new equipment, and costs of the delay to Oceus' overall performance pursuant to the Master Contract.

11.    Not only does replacement become more costly, but it creates a significant delay in the work on the IO Headquarters of not only Oceus, but many other vendors and contractors who must wait until Oceus' work is completed in order to perform their contracts.   Therefore, not only would any delay create grave economic harm to Oceus, but it could create significant delays for a project involving thousands of employees, dozens (if not hundreds) of contractors, and many millions of dollars.

12.    Oceus has already paid Powerwave approximately 65 percent of the amounts due to it for full performance under the Contract, a portion of which is comprised of advanced payments for services and support not yet rendered by Powerwave.

13.    Powerwave has breached the Contract in multiple ways, both pre- and post-petition.   For example, Pursuant to the Contract, Exhibit A, Sections 3, 7 and 9.3, and Exhibit E Section 2.1 and 2.21, Powerwave is responsible for delivery of certain goods.  Powerwave has failed to provide certain parking basement infrastructure (generic cabling, connectors, antennas, and passive radio-frequency devices that are not unique to the DAS System but essential to its operation), due at the end of January 2013, and disclosed in an email to Oceus that this default was due to the fact that the manufacturer would not extend credit to the Powerwave, and Powerwave was unable to purchase the required equipment without such credit.  A true and accurate copy of this email is attached as **Exhibit B** to the Motion to Compel. In order to ensure

delivery of the infrastructure, Oceus purchased substitute infrastructure from two other vendors, incurring to itself an additional cost of approximately $60,000. Notwithstanding Oceus' efforts to get the infrastructure installed in a timely manner, the delay encountered as a result of having to source material from other vendors in turn resulted in having to install the infrastructure on finished surfaces, thereby incurring an additional cost to Skanska of approximately $10,000 in repainting and/or establishing new cabling routes, which Skanska could now potentially charge to Oceus' account.

14.     Similarly, Powerwave failed to deliver similar infrastructure required for the administration building (the "Administration Building"), which was scheduled for delivery and installation by February 11, 2013. The total cost incurred by Oceus to purchase substitute infrastructure from another vendor was $2379.50.

15.     On February 27, 2013, Debtor informed Oceus via email that it is unable to provide new equipment, as Debtor acknowledged is required by the Contract, Ex. E, Sec. 17.1, and asked that Oceus allow refurbished equipment to be used instead. A true and accurate copy of this email is attached as **Exhibit C** to the Motion to Compel.  However, Oceus cannot accommodate Debtor's request without risking defaulting on its Master Contract with Skanska.

16.     Powerwave failed to deliver the final November test report for the Administration Building, as required by Exhibit A, Sections 9.5 and 9.6 of the Contract. The test reports ensure compliance of Powerwave's system with the system performance specifications and standards required by the Master Contract. Because portions of the Administration Building system have already been tested by the Powerwave, future inability by Powerwave to complete testing and substantiation of testing reports for the remaining portions would mean that Oceus would have to

redo testing of the entire building in order to submit a complete compliance report to Skanska, at an additional cost of approximately $85,000. [3/]

17.     Preliminary test results received from Powerwave on January 18, 2013, which should have been provided by early December, 2012,[4/] for the Administration Building show a deficiency in the system design for the 9th Floor. This design deficiency should have been corrected at Powerwave's cost per the Contract, Ex. A, Sec. 3. Powerwave's inability to correct this deficiency will mean that Oceus will have to incur additional costs to remedy, in the approximate amount of $6,500.

18.     Powerwave failed to provide appropriate professionals, namely a CAD draftsman and a CAD engineer, pursuant to Ex. A, Sections 5.1.2 and 5.1.3. of the Contract.  While a new CAD draftsman has been recently assigned by Powerwave to the project, this person will have to spend considerable time becoming familiar with the project before he or she can perform the duties required pursuant to the Contract. Additionally, while a new engineer has recently been assigned by Powerwave to the project, this engineer failed to appear at an agreed-upon time, and his future attendance to his duties is uncertain.  The lack of an on-site engineer resulted in an inability of Oceus to confirm an alternative solution proposed to the retesting of the Administration Building. In addition, not having an on-site engineer has resulted in delays in the delivery of design materials for the Parking Garage/Basement,[5/] delays in as-built drawings for the Administration Building,[6/] inability to monitor the installation and the quality of the installation for the Parking Garage/Basement,[7/] which increases the risk that otherwise correctible errors would go uncured. The cost to Oceus to replace the engineer would be

---

[3/]  *See* Contract, Ex. A, Sec. 3.2, Items 49, 50, and 52.
[4/] *See* Contract, Ex. A, Sec.8, Table 1, par. 4.
[5/] *See* Contract, Ex. A, Sec. 9.2.
[6/] *See* Contract, Ex. A, Sec. 9.6.
[7/] *See* Contract, Ex. A, Sec. 9.4.

approximately $200,000 per year until the end of the contract. Future liability of Oceus for an improperly installed DAS System is at this time unquantifiable but could reach potentially astronomical proportions.

19.     Powerwave has failed to report monitoring and alarm alerts for system outages, as required by Ex. E, Section 17.1 and Ex. A, Compliance matrix Article 1.3.35 of the Contract. Specifically, a power outage occurred over the weekend of February 2-3, 2013, but Powerwave failed to notify the appropriate parties, including Oceus, thus hampering Oceus' and Skanska's ability to track down and correct possible sources of malfunctions.

20.     Powerwave has failed to complete the drawings for the Administration Building in a timely manner, as required by Ex. A, Section 9.6 of the Contract. As a result, Oceus has had to undertake costs for production and printing of interim deliverables to Skanska at a cost of approximately $6,000. Further, this default, in tandem with the various other defaults regarding the Administration Building, has resulted in Oceus' inability to apply for verification of substantial completion under the Master Contract and invoice Skanska accordingly.

21.     Powerwave has failed to complete the location survey for Parking Garage/Basement as required by Ex. A, Sections 9.1 and 9.2 of the Contract and has consequently resulted in an inability of Oceus to invoice Skanska for the amount corresponding to the survey.

22.     On December 21, 2012, prior to Powerwave's bankruptcy filing, Oceus mailed to Powerwave a demand for adequate assurance of Powerwave's ability to complete performance based on the above-described defaults.

23.     The cost to Oceus of replacing Powerwave's system is no less than $1,008,994.25, comprised of:  (1) $599,423, the full amount Oceus would have to pay a new subcontractor to

design, provide, and support a new system; (2) $369,791.25, the approximate cost of removing

Powerwave's system from the IO Headquarters; and (3) $39,780.00 the approximate cost to

Oceus of the delay that will be created by this replacement.

24.    Oceus' damages from continuation of the Contract will increase in the next two

months by approximately $340,000 due to additional installation of Powerwave's components,

which will necessitate substantial hardware replacements, redesigning and retesting.  Every day

that passes without resolution concerning the Contract increases Oceus' damages and the

likelihood that it will default under the Master Contract due to delays caused by Powerwave's

continued defaults, resulting in irreparable harm, including not only monetary damages but also

harm to Oceus' reputation, relationship with Skanska and the IO, and delays to overall

construction on the IO Headquarters.

I declare under penalty of perjury that the foregoing is true and correct.


Daniel Goldberg

Executed on:  February 27, 2013


13503597v.3